**HARTMANN DOHERTY ROSA BERMAN & BULBULIA**
Limited Liability Partnership — Attorneys At Law

433 Hackensack Avenue, Ste. 1002
Hackensack, New Jersey 07601
t: 201.441.9056
f: 201.441.9435
www.hdrbb.com

New York Office
1270 Avenue of the Americas, Ste. 816
New York, New York 10020
t: 212.344.4619

Short Hills Office
830 Morris Turnpike, Ste. 304
Short Hills, New Jersey 07078
t: 973.467.1325

Rockland Office
2 Executive Boulevard, Ste. 300
Suffern, New York 10901
t: 845.357.7900

Miami Office
8821 SW 69th Court
Miami, Florida 33156
t: 305.419.2936

June 23, 2024

**VIA ECF**

Honorable Michael A. Shipp
United States District Judge
402 East State Street
Trenton, New Jersey 48226

    Re:    *United States of America v. Katherine Peterson*
              **Case No. 22-0621 (MAS)**

Dear Judge Shipp:

      This firm represents Defendant Katherine Peterson, whose trial commences tomorrow. On Thursday, the government identified its first witness as HHS-OIG SA Michael Pemberton, who is the case agent on this case. As a general matter, Defendant does not object to SA Pemberton's being called as a government witness. Of course, defense counsel does not know the questions the government intends to ask SA Pemberton at Ms. Peterson's trial. However, while defense counsel was preparing over the weekend to meet SA Pemberton's anticipated testimony, which included a review of SA Pemberton's testimony at the trial of Co-Defendant Steven King, it became clear that – at King's trial last year – the government introduced through SA Pemberton inadmissible lay opinions and hearsay that should have been excluded (had King's attorneys objected). *See general United States v. Fulton*, 837 F.3d 281, 293 (3d Cir. 2016) (holding that district court erred by allowing case agent to introduce lay opinion testimony that "amounted to simply dressing up argument as evidence") (internal quotation marks and citation omitted).

      For example, at Steven King's trial, the government asked SA Pemberton the following questions which elicited inadmissible responses:

    Q:    And, if a PBM found that a pharmacy had lied on the applications, what's the consequence?

    A:    They would terminate the contract. [2T18:15-18]

              \*      \*      \*

    Q:    What type of pharmacy was AAMP, based on your investigation?

    A:    Mail order?

    Q:    How did you determine that?

    A:    There is a number of ways: Through interviews ... and I'm familiar with an audit that was conducted .... [2T23:2-7]

              \*      \*      \*

Honorable Michael A. Shipp, U.S.D.J.
June 23, 2024
Page 2

    Q:    During your investigation, did you learn whether A1C pharmacies ever refused to dispense certain medications?

    A:    Yes.

    Q:    How did you learn that?

    A:    I have listened to recordings, phone calls. [2T37:20-24]

*   *   *

    Q:    Generally speaking, who writes the information into the prescription?

    A:    A doctor would. [2T43:8-10]

*   *   *

    Q:    During your investigation, did you learn how these prescriptions were filled out by the doctors?

    A:    Yes.

    Q:    What did you learn?

    A:    These forms were faxed to doctors' offices, usually multiple times. [2T46:5-10].

*   *   *

    Q:    During the course of your investigation, were you able to determine whether A1C pharmacies actually obtained patient consent before shipping all refills?

    A:    Yes. And they didn't always get consent.

    Q:    How did you learn that?

    A:    I learned through reviewing business emails, listening to phone calls, and reviewing claims data for Medicare. [2T80:2-9]

*   *   *

    Q:    Was patient consent actually obtained as a result of this max attempt instruction?

    A:    No. [2T83:16-18]

Honorable Michael A. Shipp, U.S.D.J.
June 23, 2024
Page 3

More generally, the government repeatedly asked SA Pemberton questions prefaced with "Based upon your investigation ....," and then asked for his opinion about a conclusion or characterization, and also had him interpret recordings of patient calls played for the jury.

As the Third Circuit explained in *Fulton, supra*, Federal Rule of Evidence 701 "is carefully designed to exclude lay opinion testimony that 'amounts to little more than choosing up sides, or that merely tells the jury what result to reach,'" 837 F.3d at 291 (*quoting United States v. Staudtmauer*, 620 F.3d 238, 262 (3d Cir. 2010)). Rule 701 "seeks to protect against testimony that usurps the jury's role as fact finder." *Id.* The examples of SA Pemberton's prior testimony quoted above fall into these categories as they simply tell the jury what the government wants it to conclude – *e.g.*, prescriptions were re-filled without consent – and otherwise repeats what SA Pemberton learned from out-of-court interviews, which are hearsay.

Summary testimony from a case agent is not a substitute for testimony from witness' with actual first-hand knowledge. For these reasons, the Court should limit the government's examination of its case agent to appropriate background facts (not conclusions) and "exclude testimony where the witness is no better suited than the jury to make the judgment at issue." *Fulton*, 837 F.3d at 20 (*quoting United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011) (holding that where jury had the opportunity to listen to the same recordings as the case agent, the case agent's testimony interpreting the recordings was inadmissible under Rule 701(b) because he had no "insight to offer the jurors")).

Respectfully submitted,

Mark A. Berman, Esq.

cc: All Counsel of Record (via ECF)